**'O'**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:98-cr-00749-CAS - 1 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ORDER GRANTING MOTION FOR** |
| RICHARD WAYNE PARKER, | ) | **COMPASSIONATE RELEASE** |
| | ) | |
| Defendant. | ) | |

## I.    INTRODUCTION AND BACKGROUND

"A judgment of conviction that includes a sentence of imprisonment constitutes a final judgment and may not be modified by a district court except in limited circumstances." Dillon v. United States, 560 U.S. 817, 824 (2010) (internal alterations omitted).   "Compassionate release provides an exception" to this general rule "in extraordinary cases." United States v. Holden, No. 3:13-cr-00444-BR, 2020 WL 1673440, at *2 (D. Or. Apr. 6, 2020).

Prior to December 21, 2018, "the Court could only reduce a sentence of imprisonment upon a motion of the Director of the Bureau of Prisons[.]" United States v. Esparza, No. 1:07-cr-00294-BLW, 2020 WL 1696084, at *1 n.1 (D. Idaho Apr. 7, 2020). But on December 21, 2018, Congress enacted—and the President signed into law—the

First Step Act of 2018 ("the FSA"), "with the intent of 'increasing the use and transparency of compassionate release.'" United States v. Willis, 382 F. Supp. 3d 1185, 1187 (D.N.M. 2019).  Accordingly, the FSA now "permits defendants to bring their own motions for compassionate release after first exhausting their administrative remedies with the Bureau of Prisons." United States v. Ayon-Nunez, No. 1:16-cr-00130-DAD, 2020 WL 704785, at *2 (E.D. Cal. Feb. 12, 2020).  "Although relief under the statute is commonly referred to as 'compassionate release,' such relief is not limited to immediate release, but includes a reduction in sentence." United States v. Marks, No. 03-cr-06033-L, 2020 WL 1908911, at *3 n.3 (W.D.N.Y. Apr. 20, 2020).

On January 19, 2000, the Court sentenced defendant Richard Wayne Parker ("Parker") to life imprisonment after Parker was convicted of charges related to the filing of a false tax return and the possession and distribution of cocaine. Dkt. 598.  Parker now seeks relief from that sentence, pursuant to the FSA, in the form of compassionate release.

The Court held a hearing on May 21, 2020.  Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## A.    Parker's Underlying Misconduct[1]

### 1.    Parker, Ruelas, Wilcox, and Strickler Form the "Deguello" Group

In 1990, Parker, George Michael Ruelas ("Ruelas"), Michael Richard Wilcox ("Wilcox"), and James Strickler ("Strickler") formed a conspiracy to use their collective law enforcement knowledge and experience to illegally seize narcotics and related proceeds from narcotics traffickers and then profit from these seizures by selling the seized narcotics.  The group called itself "Deguello."  At that time, Parker was a Special Agent with the California Department of Justice's Bureau of Narcotic Enforcement ("BNE"), while Wilcox and Ruelas served as California Highway Patrol ("CHP") officers, and

---

[1]    Unless otherwise specified, all references in this section are taken from the government's briefs and materials submitted in support of its sentencing position with respect to Parker's sentencing in 2000. See Dkts. 591, 592.

Strickler served as a Deputy with the Pima County Sheriff's Office in Arizona. Parker and Strickler previously served together on a narcotics task force in Tucson, Arizona, where Parker and Strickler posed as undercover buyers of narcotics. Ruelas and Wilcox were former classmates at the CHP Academy. Parker and Ruelas are half-brothers.

The Deguello group thereafter began executing raids of residences belonging to suspected narcotics traffickers. During the raids, members of the Deguello group would represent that they were executing a legitimate search warrant in the pursuit of narcotics or proceeds derived from the sale of narcotics. In reality, however, participating members would seize any contraband found for the members' own benefit.

### 2.   Parker Recruits Pitto

At the time that Parker first met Wilcox in 1986 or 1987, Wilcox was married to Monica Pitto ("Pitto"). In 1992, Parker approached Pitto about the prospect of Pitto selling a kilogram of cocaine that Parker had obtained. Parker proposed that if Pitto would sell the kilogram of cocaine on Parker's behalf, Parker would split the profits with her. Pitto agreed and successfully sold the cocaine, receiving some $7,500.00 from Parker in return.

On several other occasions, Parker, through Pitto, successfully sold narcotics to Gerhard Hensel ("Hensel"). Although Hensel was arrested in 1993, Hensel thereafter informed Pitto in 1996 that he was ready to resume distributing cocaine, prompting Pitto to contact Parker.

### 3.   The Deguello Group Burglarizes the BNE Vault

In late 1996 or early 1997, the Deguello group identified the evidence vault at the BNE's office located in Riverside, California ("the BNE vault") as a potential target for the group's theft-related activities. Ruelas, Parker, and Wilcox subsequently met in person on several occasions to plan and prepare to seize narcotics from the BNE vault, settling on July 4, 1997, as the scheduled date of the proposed burglary. For example, in June 1997, Ruelas, Parker, and Wilcox purchased equipment to be used in the burglary including a hydraulic door spreader, two-way radios, and alligator clips. In his position as a BNE Special Agent, Parker served as a back-up evidence custodian for the BNE's Riverside

Office, and the BNE provided Parker with a key and the alarm codes to the BNE vault. Pursuant to the plan, Parker provided his key and the alarm codes to the BNE vault to Ruelas and Wilcox so that Ruelas and Wilcox could gain access to the BNE vault.

On July 4, 1997, Ruelas and Wilcox arrived at the BNE's office in Riverside, California. Ruelas entered the BNE's office, while Wilcox served as the "lookout" in a rented automobile. Ruelas loaded several duffel bags with cocaine stored in the BNE vault and carried them to the car, and the pair then departed for a hotel room. Ruelas and Wilcox returned to the BNE's Riverside office several hours later, and Ruelas again removed additional quantities of cocaine from the BNE vault, placing the cocaine in duffel bags.

Wilcox subsequently stored the cocaine at a friend's residence in Fresno, California. In all, Ruelas and Wilcox removed some 295 kilograms of cocaine from the BNE vault.

### 4.     Parker Distributes the Cocaine Taken from the BNE Vault

Parker and Ruelas periodically telephoned Wilcox, instructing Wilcox to prepare the cocaine for pick up. Ruelas or Parker would then travel to Fresno to pick up the cocaine. Parker supplied the cocaine to Pitto, who in turn sold the cocaine to Hensel. In addition, Pitto and Parker began supplying the cocaine to Christine Whitney ("Whitney"), who in turn sold the cocaine to other buyers.

### 5.     FBI Agents Arrest Parker

In May 1998, Federal Bureau of Investigation ("FBI") agents arrested Hensel in an unrelated investigation. During that investigation, agents discovered cocaine that Hensel purchased from Pitto. Hensel cooperated with the government, agreeing to make monitored calls to Pitto to arrange for the purchase of additional quantities of cocaine.

During one such transaction on July 2, 1998, Pitto indicated to Hensel that Pitto would soon be meeting with Pitto's supplier. Agents followed Pitto to the rooftop of a parking garage, where Pitto provided Parker with an envelope containing cash. Agents then apprehended Pitto and Parker, placing them under arrest. While searching Parker's vehicle, agents discovered firearms, ammunition, and large sums of cash. During a post-arrest search of Parker's residence, agents found additional sums of money.

-4-

**B.      Parker's Indictment, Conviction, and Appeal**

On March 25, 1999, a federal grand jury returned a third superseding indictment, charging Parker with eight counts, including: (1) conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1); (2) possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1); (3) subscribing a false name on a tax return, in violation of 26 U.S.C. § 7206(1); and (4) money laundering, in violation of 18 U.S.C. § 1957.  Dkt. 257.  Trial commenced on April 20, 1999, and the jury returned its verdict on June 25, 1999.  Dkts. 319, 414.  The jury convicted Parker of subscribing to a false tax return, but acquitted Parker of the money laundering charge and two counts related to possession with the intent to distribute cocaine. The jury was unable to reach a verdict as to the remaining conspiracy and possession counts, and the Court declared a mistrial on those counts, ordering a retrial.  Dkt. 412.  The retrial commenced on October 6, 1999.  Dkt. 549.  On October 21, 1999, the jury returned its verdict, convicting Parker of each of the four remaining counts.  Dkt. 578.

On January 19, 2000, the Court sentenced Parker to, *inter alia*, life imprisonment and five years of supervised release.  Dkt. 598.  The Court imposed a life sentence because of three enhancements pursuant to the-then binding United States Sentencing Guidelines: (1) a two-level increase for possession of a dangerous weapon; (2) a four-level increase for being "an organizer or leader of a criminal activity that involved five or more participants"; and (3) a two-level increase for abuse of a position of trust.[2]

/ / /

/ / /

/ / /

/ / /

---

[2]      Prior to the United States Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), "sentencing judges were bound by the Guidelines."  United States v. Ameline, 409 F.3d 1073, 1077 (9th Cir. 2005) (en banc).

-5-

Parker thereafter appealed to the United States Court of Appeals for the Ninth Circuit.  Dkt. 600.  The Ninth Circuit affirmed Parker's conviction on August 1, 2001.[3] See United States v. Parker, 16 F. App'x 682 (9th Cir. 2001).

### C.    Ruelas' Indictment, Trial, Appeal, and Release

Following Parker's indictment, the government continued its investigation into the Deguello group's activities.  A federal grand jury returned an indictment against Ruelas in December 1999.  See United States v. Ruelas, No. 2:99-cr-01363-CAS (C.D. Cal.), Dkt. 3.  Ruelas' trial commenced on April 24, 2002, and on May 8, 2002, the jury returned its verdict, convicting Ruelas of two counts: (1) conspiracy to possess with the intent to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1); and (2) possession with the intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1).  Ruelas, Dkts. 230, 238.  On November 21, 2002, the Court sentenced Ruelas to, *inter alia*, a term of 360 months imprisonment and five years of supervised release.  Ruelas, Dkt. 263.

The Ninth Circuit affirmed Ruelas' conviction on May 5, 2004.[4]  See United States v. Ruelas, 98 F. App'x 615 (9th Cir. 2004).  Ruelas thereafter petitioned the Supreme Court for a writ of certiorari, which the Supreme Court granted on January 24, 2004, remanding for resentencing in light of Booker.  Ruelas v. United States, 543 U.S. 1103 (2005).  Upon remand from the Supreme Court, the Ninth Circuit affirmed Ruelas' conviction but remanded so that this Court could consider the Ninth Circuit's Ameline ruling when resentencing Ruelas.[5]  See United States v. Ruelas, 412 F.3d 1051 (9th Cir. 2005).

---

[3]    Parker has filed multiple motions and petitions for post-trial relief, which have previous been denied.  The Court does not again address these motions and petitions here.

[4]    Ruelas has filed multiple motions and petitions for post-trial relief, which the Court also does not address here.

[5]    In Ameline, the Ninth Circuit held "when we are faced with an unpreserved Booker error that may have affected a defendant's substantial rights, and the record is insufficiently clear to conduct a complete plain error analysis, a limited remand to the district court is appropriate for the purpose of ascertaining whether the sentence imposed would have been

Following remand from the Ninth Circuit, the Court resentenced Ruelas to 228 months in prison on October 17, 2006, followed by five years of supervised release. The Ninth Circuit affirmed Ruelas' reduced sentence on August 7, 2008. See United States v. Ruelas, 286 F. App'x 528, 529 (9th Cir. 2008). Ruelas was released from prison in 2016. See Dkt. 956 at 1.

### D.   Parker's Motion for Compassionate Release

On January 13, 2020, Parker, acting *pro se*, filed a motion for compassionate release. Dkt. 935 ("Mot."). The government filed an opposition on February 7, 2020. Dkt. 949 ("Opp."). Parker, now represented by counsel, filed a reply on April 21, 2020. Dkt. 960 ("Reply"). The government filed a surreply on May 7, 2020. Dkt. 961 ("Surreply").

## II.   LEGAL STANDARD

"Compassionate release is governed by 18 U.S.C. § 3582(c)". Willis, 382 F. Supp. 3d at 1187. The FSA modified Section 3582(c)(1)(A)(i) to allow for compassionate release when three requirements are met: "First, as a threshold matter, the statute requires defendants to exhaust administrative remedies. Second, a district court may grant compassionate release only if 'extraordinary and compelling reasons warrant such a reduction' and 'that such reduction is consistent with applicable policy statements issued by the Sentencing Commission.' Third, the district court must also consider 'the factors set forth in Section 3553(a) to the extent they are applicable.'" United States v. Rodriguez, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019) (citing 18 U.S.C. § 3582(c)(1)(A)(i)). The FSA "grants broad discretion to the district courts in providing relief[.]" Jones v. United States, No. 4:98-cr-10-01, 2020 WL 219311, at *3 (E.D. Va. Jan. 6, 2020).

---

materially different had the district court known that the sentencing guidelines were advisory. If the district court responds affirmatively, . . . [t]he original sentence will be vacated by the district court, and the district court will resentence the defendant." 409 F.3d at 1074. In its remand order, the Ninth Circuit specifically noted that "Ruelas did not challenge his sentence on Sixth Amendment grounds in the district court[.]" Ruelas, 412 F.3d 1051.

1    **III.   DISCUSSION**

2        **A.    Exhaustion of Legal Remedies**

3        The Court "may entertain an inmate's request for compassionate release under 18

4    U.S.C. § 3582(c)(1)(A)(i) only (1) 'after he has fully exhausted all administrative rights to

5    appeal a failure of the Bureau of Prisons to bring a motion' on his behalf or (2) after 'the

6    lapse of 30 days from the receipt of such a request by the warden of the defendant's facility,

7    whichever is earlier.'" United States v. Cooper, No. 2:14-cr-00228-JAD-CWH, 2020 WL

8    2064066, at *2 (D. Nev. Apr. 29, 2020) (internal alterations omitted) (citing 18 U.S.C. §

9    3582(c)(1)(A)).   In addition, "[e]xhaustion occurs when the BOP denies a defendant's

10   application[.]"   United States v. Mondaca, No. 89-cr-00655-DMS, 2020 WL 1029024, at

11   *2 (S.D. Cal. Mar. 3, 2020) (internal citation omitted).   The government disputes that

12   Parker has satisfied Section 3582(c)'s exhaustion requirement to the extent that Parker

13   seeks compassionate release on grounds related to COVID-19.

14       **1.    Prior to the COVID-19 Pandemic, Parker Requests Compassionate**

15       **Release from the Warden, the Warden Denies Parker's Request,**

16       **Parker Files the Present Motion, and the Government Files its**

17       **Opposition**

18       Parker submitted a request for compassionate release to the warden of the Federal

19   Correctional Institution in Florence, Colorado ("FCI Florence") on December 10, 2019.

20   Mot. at 2.  Parker's request to the warden states that Parker's "request is based upon several

21   factors: (1) exemplary conduct while in custody, (2) extensive programming that includes

22   two associates degrees obtained in custody, (3) age, and (4) deteriorating medical

23   condition."  Dkt. 935-1 at 2.  Parker's request to the warden specifically indicates that

24   Parker suffers from medical conditions including degenerative joint disease in his

25   shoulders, diabetes, and hypertension. Id. at 8.  The warden denied Parker's request on

26   December 19, 2019. See dkt. 949-1, Exh. A.

27       Parker subsequently filed his motion for compassionate release with the Court on

28   January 13, 2020. See Mot.  Parker's motion, which Parker prepared *pro se*, reasons that

"'extraordinary and compelling' circumstances combined with [Parker's] being an elderly inmate over 65 years of age with medical conditions related to aging that will not improve," including degenerative joint disease, diabetes, and hypertension, justify Parker's compassionate release. Mot. at 1. The government filed its opposition on February 7, 2020. See Opp. The government's opposition does not specifically challenge Parker's motion on exhaustion grounds. See generally id.

### 2. The State of California and the Federal Government Act in Response to COVID-19

On March 4, 2020, the Governor of the State of California "proclaimed a state of emergency in California as the result of COVID-19." Grano v. Sodexo Mgmt., Inc., No. 18-cv-01818-GPC-BLM, 2020 WL 1975057, at *1 (S.D. Cal. Apr. 24, 2020). "[T]he World Health Organization declared COVID-19 a global pandemic on March 11, 2020;" the President "declared the outbreak to constitute a national emergency on March 13, 2020;" and the Governor of the State of California "issued a shelter in place order on March 19, 2020." United States v. Lopez, No. 1:20-MJ-00046-SAB, 2020 WL 1433158, at *1 (E.D. Cal. Mar. 24, 2020). On March 13, 2020, the Bureau of Prisons ("BOP") released an action plan to address the threat of COVID-19 in BOP facilities. United States v. French, No. 1:12-cr-00160-JAW, 2020 WL 1539926, at *7 (D. Me. Mar. 31, 2020). "The plan is focused on restricting inmate movement and social and legal visits, as well as providing screening for COVID-19 and isolating those with symptoms." Id. On March 26, 2020, and on April 3, 2020, the Attorney General of the United States issued memoranda directing the BOP "'to grant home confinement to inmates seeking home confinement in connection with the ongoing COVID-19 pandemic' and 'immediately process them for transfer[.]'" United States v. Percoco, No. 16-cr-00776-VEC, 2020 WL 2143033, at *1 (S.D.N.Y. May 5, 2020) (internal citation and alterations omitted).

### 3. Parker's Reply and the Government's Surreply

Parker, now represented by counsel, subsequently filed his reply on April 21, 2020. See Reply. According to Parker, "Parker's request for compassionate release had

substantial merit when it was filed on January 13, 2020.  Now, as a person whose risk factors for COVID-19 are serious and manifold, [his] need for release is even more urgent." Reply at 2.  In response, the government contends that "[b]ecause [Parker] failed to raise COVID-19-based claims in the request that he filed with the BOP on December 10, 2019, [Parker] has failed to comply with the mandatory exhaustion requirement of 18 U.S.C. § 3582(c)—requiring dismissal of the motion or, at minimum, a stay until the BOP has had an opportunity to assess [Parker's] yet-to-be-filed request for compassionate release raising COVID-19-based claims."  Surreply at 1.

The Court does not find the government's exhaustion arguments availing.  "[T]he first known case of COVID-19 in the United States was only reported in late January" 2020.  Favi v. Kolitwenzew, No. 20-cv-02087, 2020 WL 2114566, at *1 (C.D. Ill. May 4, 2020).  It does not follow, then, that at the time Parker filed his administrative request for compassionate release with the warden in December 2019, Parker was required to specifically identify COVID-19—a disease which had not yet been detected in the United States—as the basis for his request.  Nor does it follow that Parker has failed to satisfy Section 3582(c)'s exhaustion requirement because Parker's reply brief in support of his motion for compassionate release raises COVID-19, while his initial administrative request to the warden did not.

The government argues that Section 3582(c)'s exhaustion requirement is "jurisdictional" or "is at least a mandatory claim-processing rule that must be enforced[.]" Surreply at 11.  According to the government, then, "[c]onsistent with these rules, numerous courts have rejected similar claims in the context of unexhausted COVID-19 based requests for compassionate release."  Id. at 12 (collecting cases).  Assuming arguendo that Section 3582(c)'s exhaustion requirement is jurisdictional or is at least a mandatory claim processing rule, many of the COVID-19 specific cases the government relies upon for its exhaustion argument are distinguishable.  See United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020) ("Raia failed to comply with § 3582(c)(1)(A)'s exhaustion requirement: BOP has not had thirty days to consider Raia's request to move for

compassionate release on his behalf, and there has been no adverse decision by BOP for Raia"); United States v. Shah, 8:10-cr-00070-CJC (C.D. Cal. Mar. 30, 2020) (Dkts. 325-1, 329 at 3) (denying motion for compassionate release where motion raised health issues related to COVID-19 but operative administrative request to warden "did not raise which compassionate release method you are seeking"); United States v. Sloane, No. 1:19-cr-10117-IT-11 (D. Mass. Mar. 19, 2020) (Dkt. 647 at 2) (denying inmate's motion for compassionate release because inmate's motion "does not state that a request has been made to the warden."); United States v. Gileno, No. 3:19-CR-00161-VAB, 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020) (denying inmate's motion for compassionate release because inmate "has not satisfied the requirement . . . to first request that the Bureau of Prisons file a motion on his behalf and then show that thirty days have passed without any BOP action."); United States v. Eberhart, No. 13-cr-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) (denying inmate's request for compassionate release because [o]n the threshold exhaustion or 30-day requirement, defendant does not represent that he has exhausted his administrative remedies with the BOP"); United States v. Neman, No. 2:14-cr-00521-JAK (C.D. Cal. Mar. 30, 2020) (Dkt. 863 at 3) (denying inmates' motion for compassionate release where inmates "acknowledged that the Warden has not yet refused to bring a motion on their behalf," "that the 30-day period has not passed," and "that they have not yet exhausted their administrative remedies."); United States v. Bonventre, No. 10-cr-228-LTS, 2020 WL 1862638, at *1 (S.D.N.Y. Apr. 14, 2020) (denying inmate's motion for compassionate release because "the grounds upon which [the inmate] moves before this Court differ materially from those advanced" in inmate's original administrative request to warden where original administrative request cited "an Act of Congress" and "the recommendation of a Judge" while inmate's motion "cite[d] medical conditions that allegedly make him more vulnerable to the COVID-19 virus").

A number of other courts have rejected the government's argument that an inmate must first raise COVID-19 in an administrative request to the warden in order to raise COVID-19 in connection with a motion seeking compassionate release from the court. For

example, in <u>United States v. Resnick</u>, a federal inmate submitted a request for compassionate release to the warden on February 26, 2020. No. 14-cr-810-CM, 2020 WL 1651508, at *5 (S.D.N.Y. Apr. 2, 2020). The inmate's request did not specifically raise the threat of COVID-19 in the inmate's prison. <u>Id.</u> Instead, the inmate's administrative request consisted of a generic, administrative form which "permits an inmate to check only one box on the form," and the inmate checked a box "for release based on age and service of sentence[.]" <u>Id.</u> On March 28, 2020, the inmate's attorney submitted an additional administrative request to the warden, "which . . . relies specifically on [the inmate's] particular susceptibility to COVID-19." <u>Id.</u> at *6. The court rejected the government's argument that the inmate had not satisfied Section 3582(c)'s exhaustion requirement because the attorney's subsequent request to the warden raised COVID-19 while the inmate's initial request did not:

> The Government's argument is sheer sophistry. Resnick has exhausted. He submitted a request to the Warden; more than thirty days passed since he did so; the Warden failed to act within those thirty days; so he filed an appeal to this, his sentencing court, as is his right under the First Step Act. That alone was enough. Now we have the new news that his first administrative request was denied on the merits. No more is required.

> If the Government is suggesting that this court—which has undoubted jurisdiction because Resnick's original application for compassionate[] release has been exhausted—cannot take into account things that have occurred since February 26— things that render Resnick's situation even more parlous than it was a month ago, because he has not 'exhausted' those grounds, I am again constrained to disagree. I am considering Resnick's situation today. I would be a fool not to consider what has happened in this country in the 35 days since Resnick originally applied for compassionate release.

<u>Id.</u>

Two other courts in the Central District of California recently reached similar conclusions, determining that inmates had satisfied Section 3582(c)'s exhaustion requirement where the inmates' motions for compassionate release raised COVID-19 but

their administrative requests to their respective wardens did not.[6]  In <u>United States v. Krokos</u>, the court rejected the government's argument that because the inmate "has not raised his COVID-19 arguments to the BOP," the court "should stay [the inmate's] request for compassionate release until the BOP can evaluate the risks he faces in connection with COVID-19." 2:12-cr-00527-GW (C.D. Cal. May 1, 2020) (Dkt. 1016 at 3).  The court noted that the inmate "has already fully raised his medical ailments to the BOP" and that the inmate "does not raise any new ailments to the Court that he did not present to the BOP; rather, he raises the same ailments and argues additionally that these ailments make him particularly susceptible to COVID-19." <u>Id.</u> at 3.  Accordingly, the court concluded that "[t]he fact that [the inmate] points to the current COVID-19 crisis as further support for his request for compassionate release does not negate his previous exhaustion of administrative remedies." <u>Id.</u>  Similarly, in <u>United States v. Doganyan</u>, the court determined that an inmate had satisfied Section 3582(c)'s exhaustion requirement where "[t]he medical bases for his claim were presented to the BOP" because "it is simply not the case that [the inmate] has a 'Factor II deficiency claim' and now a separate 'COVID-19' claim." 2:16-cr-00407-MWF-3 (C.D. Cal. Apr. 29, 2020) (Dkt. 260 at 2).  That is because "[t]he COVID-19 emergency . . . is simply a new lens through which to view the merits of [the inmate's] exhausted claim." <u>Id.</u>

Here, although Parker's request to the warden did not specifically raise COVID-19, it did explicitly raise Parker's diabetes, hypertension, and degenerative joint disease. <u>See</u> Dkt. 949-1.  Parker's reply simply avers that in light of the COVID-19 pandemic, these same medical conditions, which formed the basis for the administrative compassionate release request that Parker submitted to the warden and which the warden has indisputably

---

[6]    Another court in the Central District of California recently reached a contrary conclusion.  <u>See</u> <u>United States v. Arrona</u>, No. 5:17-cr-001142-JFW (C.D. Cal. May 13, 2020) (Dkts. 153 at 2) (denying inmate's motion for compassionate relief on exhaustion grounds because inmate "filed a compassionate-release request with the Warden . . . that . . . did not raise any COVID-19 related concerns, which are central to [inmate's] Motion.").

-13-

already denied, "are of even greater significance than they were when [Parker's] *pro se* motion was filed." Reply at 2; cf. <u>United States v. York</u>, No. 3:11-cr-00076, 2019 WL 3241166, at *3–6 (E.D. Tenn. July 18, 2019) (rejecting argument that "to the extent [an inmate] believes his medical conditions have worsened, he should submit a new request to the BOP before presenting it to the Court" where the warden had previously denied inmate's two previous administrative requests for compassionate release based on his medical conditions because inmate "filed administrative requests with the BOP in both 2016 and 2018, requesting compassionate release on the same grounds as the instant motion."). Accordingly, because Parker filed an administrative request for compassionate release with the warden based on the same medical conditions which form the basis for Parker's present motion, and because the warden denied that request, Parker has satisfied Section 3582(c)(1)(A)'s exhaustion requirement.[7] See <u>United States v. Joling</u>, No. 6:11-cr-60131-AA, 2020 WL 1903280, at *2 (D. Or. Apr. 17, 2020) ("Exhaustion occurs when the BOP denies a defendant's application or lets thirty days pass without responding to it.").

## B.    Extraordinary and Compelling Reasons

### 1.    Caselaw Regarding Extraordinary and Compelling Reasons

Section 3582(c) "provides a path for defendants in 'extraordinary and compelling circumstances' to be released from prison early." <u>Rodriguez</u>, 424 F. Supp. 3d at 681 (citing 18 U.S.C. § 3582(c)(1)(A)). "Such a sentence reduction must comply with the 18 U.S.C. § 3553(a) factors and 'applicable policy statements issued by the Sentencing Commission.'" <u>Rodriguez</u>, 424 F. Supp. 3d at 681 (citing 18 U.S.C. § 3582(c)(1)(A)).

---

[7]    In addition, Parker's administrative request to the warden also indicates that Parker's request was based on factors other than his medical condition including Parker's "exemplary conduct while in custody" and the fact that his "sentence in regards to his co-defendants and others similarly charged . . . is simply unreasonable." Dkt. 935-1 at 2–3. The government does not dispute that Parker has satisfied Section 3582(c)'s exhaustion requirement to the extent that Parker's motion is based upon these grounds.

-14-

"*Before the FSA's passage*, the Commission concluded 'extraordinary and compelling reasons' are limited to four scenarios." Rodriguez, 424 F. Supp. 3d at 681 (emphasis added). "These include: (1) a 'terminal illness' or 'a serious physical or medical condition' from which the defendant 'is not expected to recover'; (2) a 'serious deterioration in physical or mental health,' due to aging; . . . (3) the 'death or incapacitation of the caregiver of the defendant's minor child'" or of the defendant's spouse; and (4) a catch-all provision. United States v. Fuentes, No. 2:07-cr-0248-11-WBS, 2020 WL 1937398, at *3 (E.D. Cal. Apr. 22, 2020) (citing U.S.S.G. § 1B1.13, cmt 1.).

"[T]he Sentencing Commission has not amended the Guidelines following the [enactment of the] First Step Act[.]" United States v. Brown, 411 F. Supp. 3d 446, 449 n.1 (S.D. Iowa 2019). Accordingly, a "growing number of district courts have concluded this means the Commission lacks an applicable policy statement regarding when a judge can grant compassionate release." Id. at 449; accord United States v. Beck, 425 F. Supp. 3d 573 (M.D.N.C. 2019) ("There is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act."); United States v. Cantu, 423 F. Supp. 3d 345, 351 (S.D. Tex. 2019) ("Given the changes to the [FSA], the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute[.]"). These courts have concluded that the scenarios for compassionate release, reflected in the Sentencing Commission's policy statement codified in U.S.S.G. § 1B1.13, no longer limit the circumstances under which a defendant may seek compassionate release pursuant to Section 3582(c)—instead, "the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 . . . warrant granting relief." Id. at 352; see also United States v. Fox, No. 2:14-cr-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts."); Beck, 425 F. Supp. 3d at 573 ("courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement.");

-15-

*Rodriguez*, 424 F. Supp. 3d at 681–82 ("This court follows the growing number of district courts that have concluded that, in the absence of applicable policy statements, courts can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 . . . warrant compassionate release.") (internal citation and quotation marks omitted); accord United States v. Chan, No. 96-cr-00094-JSW-13, 2020 WL 1527895, at *5 (N.D. Cal. Mar. 31, 2020); United States v. Kesoyan, No. 2:15-cr-236-JAM, 2020 WL 2039028, at *4 (E.D. Cal. Apr. 28, 2020); Joling, 2020 WL 1903280, at *3; but see Riley v. United States, No. 19-cv-1522-JLR, 2020 WL 1819838, at *8 (W.D. Wash. Apr. 10, 2020) (rejecting inmate's argument that "courts should disregard the policy statement found in USSG § 1B1.13 because the Sentencing Commission has not amended the statement following enactment of the First Step Act.").

This Court recently addressed the split of authority regarding the applicability of the Sentencing Commission's prior policy statements in United States v. Wade, No. 2:99-cr-00257-CAS-3, 2020 WL 1864906, at *5 (C.D. Cal. Apr. 13, 2020). In that case, the Court rejected the argument "that the pre-FSA categories contained in U.S.S.C. § 1B1.13 limit this Court's discretion to determine whether [an inmate] has raised 'extraordinary and compelling' circumstances that justify the modification of her sentence[.]" Id. With these principles and decisions in mind, the Court next considers whether "extraordinary and compelling" circumstances warrant Parker's request for a sentence reduction in this case.

> **2.     Changes in the Law, Parker's Health, and the COVID-19 Pandemic Present Extraordinary and Compelling Circumstances**

Parker contends that extraordinary and compelling circumstances justify his compassionate release because he: (1) is sixty-five years old; (2) is experiencing a serious deterioration in health due to degenerative joint disease in his shoulders, cataract issues, Type 2 diabetes, and hypertension; and (3) has served more than ten years of his sentence. Mot. at 4. Parker's argument tracks the Sentencing Commission's pre-FSA policy statement which provides that "extraordinary and compelling" reasons for compassionate release exist based on the inmate's advanced age and deteriorating health. See U.S.S.G. §

-16-

1B1.13, cmt. n.1(B). Parker's reply brief also raises the ongoing COVID-19 pandemic, urging that Parker "is particularly vulnerable to contracting the virus due to his limited mobility, and he is particularly vulnerable to severe complications and death due to his age and underlying medical issues." Reply at 6. The government argues that Parker has failed to establish that extraordinary and compelling reasons for compassionate release exist because, according to the government, Parker's "conditions do not constitute deterioration that is sufficiently serious and extraordinary to grant him the relief he seeks." Opp. at 15.

Even prior to the current COVID-19 pandemic, courts have concluded that medical conditions similar or identical to those that Parker suffers from—including diabetes, arthritis, and hypertension—in and of themselves may cause "a serious deterioration in physical or mental health because of the aging process" sufficient to constitute "extraordinary and compelling" circumstances pursuant to the Sentencing Commission's pre-FSA policy statements. See, e.g., United States v. Cantu-Rivera, No. 89-cr-204-H, 2019 WL 2578272, at *1 (S.D. Tex. June 24, 2019) (determining that inmate "meets the age-related definition of extraordinary and compelling circumstances in U.S.S.G. § 1B1.13, comment. (n.1(B))" because inmate "is 69 years old" and "is experiencing serious deterioration in physical health because of the aging process (arthritic conditions in multiple joints, cataracts, diabetes, prostrate conditions)"). Since the onset of the COVID-19 pandemic, courts have determined that inmates suffering from conditions such as hypertension and diabetes are now at an even greater risk of deteriorating health, presenting "extraordinary and compelling" circumstances that may justify compassionate release. See United States v. Rodriguez, No. 2:03-cr-00271-AB, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (determining, with respect to inmate suffering from conditions including diabetes and high blood pressure, "nothing could be more extraordinary and compelling than this pandemic."); accord United States v. Zukerman, No. 16-cr-194-AT, 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (determining that inmate suffering from "diabetes, hypertension, and obesity" demonstrated "extraordinary and compelling" circumstances justifying compassionate release, in light of COVID-19 pandemic, because "the CDC . . .

-17-

has explained that individuals over the age of 65 and people of any age who have serious underlying medical conditions, including heart conditions, diabetes, and obesity, are at higher risk for severe illness from COVID-19."); <u>United States v. Colvin</u>, No. 3:19-cr-179-JBA, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (determining that inmate "has demonstrated extraordinary and compelling reasons justifying her immediate release under Section 3582(c)(1)(A) and U.S.S.G. § 1B1.13" because inmate "has diabetes, a serious medical condition, which substantially increases her risk of severe illness if she contracts COVID-19.") (internal quotation marks and alterations omitted); <u>United States v. Pena</u>, No. 15-cr-551-AJN, 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension[.]").

Here, Parker provides the Court with medical records detailing his various medical conditions, including: (1) a summary from the BOP verifying Parker's diabetes, hypertension, cataracts, and osteoarthritis; (2) a summary of a March 3, 2020 medical visit, indicating that Parker's osteoarthritis "is severely disabling" and causes Parker "difficulty moving his arms away from his body or performing personal hygiene or sleeping"; and (3) a summary from a January 21, 2020 BOP "clinical encounter," indicating that Parker has "minimal to no movement over head and shoulder."[8] Dkt. 960-1, Exh. C. Parker's medical conditions are indeed serious and, in connection with the COVID-19 pandemic, present

/ / /
/ / /
/ / /
/ / /
/ / /

---

[8] The government appears to challenge the statement in Parker's medical records indicating that Parker has difficulty "performing personal hygiene" as "recapitulation of [Parker's] statements, rather than a medical opinion." Surreply at 18 n.1.

-18-

"extraordinary and compelling" circumstances, for the purposes of U.S.S.G. § 1B1.13[9], which warrant a sentence reduction pursuant to Section 3582(c)(1)(A).[10]

In addition, the Court may make an "independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)." Beck, 425 F. Supp. 3d at 573. The Court's "independent assessment" in this case reveals that additional "extraordinary and compelling" circumstances justify a reduction in Parker's sentence. In 2000, pursuant to the then-mandatory sentencing guidelines, the Court sentenced Parker to life imprisonment. Dkt. 598. In 2005, the Supreme Court subsequently determined in Booker that insofar as the guidelines were mandatory, they were unconstitutional, rendering the guidelines "effectively advisory." Ameline, 409 F.3d at 1077. Courts have specifically recognized the significance of Booker where, pursuant to other provisions of the FSA, inmates have sought reductions of sentences imposed prior to Booker. See Jones, 2020 WL 219311, at *4 ("The retroactive nature of the [FSA] provides long-awaited relief to those sentenced under the unconstitutionally imposed mandatory guideline ranges."); accord United States v. Stanback, 377 F. Supp. 3d 618, 625 (W.D. Va. 2019) ("The court finds that it has authority under 18 U.S.C. § 3582(c)(2) to modify Stanback's sentence, taking into account the advisory nature of the guidelines after Booker and the considerations set forth in 18 U.S.C. § 3553(a)."). The Court notes that Ruelas, Parker's half-brother and co-conspirator, was eligible for resentencing in light of Booker, and the Court ultimately reduced Ruelas' sentence from 360 months to 228 months. By contrast, until the enactment of the FSA,

---

[9]     Although the Court is not bound by the specific categories of "extraordinary and compelling" circumstances delineated in U.S.S.G. § 1B1.13, "the old policy statement provides helpful guidance[.]" Beck, 425 F. Supp. 3d at 579.

[10]    The government acknowledges that Parker suffers from diabetes, which is a "serious, chronic health condition" that "potentially qualif[ies] under the policy statement in light of the risk of infection of COVID-19." Surreply at 17.

-19-

Parker was not eligible for resentencing in light of <u>Booker</u> and is currently serving life in prison, pursuant to a judgment rendered under a sentencing regime that is no longer in effect and has since been declared unconstitutional.

Pursuant to the FSA, "the amended § 3582(c)(1)(A)(i) vests courts with independent discretion to determine whether there are 'extraordinary and compelling reasons' to reduce a sentence." <u>United States v. Decator</u>, No. 95-cr-0202-CCB, 2020 WL 1676219, at *3 (D. Md. Apr. 6, 2020).  In exercise of that discretion, the Court concludes that the severity of Parker's life sentence, imposed under a sentencing regime that is longer valid, coupled with his deteriorating health, which may be further exacerbated by his incarceration during the COVID-19 pandemic, present "extraordinary and compelling" circumstances that justify a reduction in Parker's sentence.

### C.    Consistency with Section 3553(a) Factors

Having determined that Parker has satisfied Section 3582(c)'s exhaustion requirement and that "extraordinary and compelling" reasons for a sentence reduction exist, "the Court must next consider the factors set forth in section 3553(a) to the extent they are applicable[.]" <u>United States v. Redd</u>, No. 1:97-cr-00006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020).  These factors include: "the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims." <u>United States v. Carty</u>, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (citing 18 U.S.C. § 3553(a)(1)–(7)).  The Court addresses these factors in turn.

### 1.    Nature and Circumstances of the Offense and History and Characteristics of the Defendant

The first of the Section 3553(a) factors considers "the nature and circumstances of the offense and the history and characteristics of the defendant[.]"  18 U.S.C. § 3553(a)(1).

The government argues that this factor weighs heavily against granting Parker's request for compassionate release. For example, the government asserts that Parker "was the ringleader of a significant drug conspiracy that had far-reaching effects: the cocaine stolen from the BNE evidence vault ended up in multiple states." Opp. at 19. The government contends that Parker "had the capacity to, and was prepared to, engage in violent acts if necessary to further his drug trafficking activity." Id. The government urges that "the Court should not grant compassionate release to [Parker] given his abuse of his position of trust as a BNE agent and disregard for, and subversion of, the laws he swore to uphold." Id.

The Court agrees that the nature and circumstances of Parker's underlying offenses, including his leadership of a drug distribution network, his abuse of a position of trust, and his submitting a false tax return, are serious. However, "evidence of postsentencing rehabilitation may plainly be relevant to 'the history and characteristics of the defendant.'" Pepper v. United States, 562 U.S. 476, 491 (2011) (citing 18 U.S.C. § 3553(a)(1)). Indeed, "[s]everal courts have . . . considered a defendant's rehabilitation in granting compassionate release." United States v. Brown, No. 4:05-cr-00227-1, 2020 WL 2091802, at *7 (S.D. Iowa Apr. 29, 2020).

Here, in connection with his motion for compassionate release, Parker submits documentation of his rehabilitation during incarceration.[11] For example, in the time since the Court sentenced Parker, Parker has earned two Associate of Arts degrees in Social Science and Technical Studies and has taken a number of other continuing education courses. See Dkts. 935-2, 935-3. In addition, during his incarceration, Parker has not been the subject of any disciplinary incidents and has held a number of jobs, including as an

---

[11]   The government does not appear to specifically challenge Parker's accomplishments during his incarceration. The government instead argues that Parker's "age and purported rehabilitation alone do not satisfy his burden" because, according to the government, "[t]he standard for compassionate release is not just whether someone is elderly and has performed well in prison." Surreply at 20.

education instructor, as a "suicide companion," and as a career services clerk.  See Dkts. 935-5, 935-6.   Other courts have considered similar accomplishments by an inmate sufficient to establish the inmate's rehabilitation, favoring a sentence reduction.   See Brown, 2020 WL 2091802, at *7 (finding that inmate's "rehabilitation cuts in favor of [compassionate] release" where inmate "has not had a single disciplinary incident."); Decator, 2020 WL 1676219, at * 4 (finding that Section 3553(a)(1) factor favored compassionate release because, *inter alia*, "[w]hile incarcerated, Decator has participated in extensive education and rehabilitative programming; he has participated in over 1,500 hours of programming and has completed more than 70 courses" and "has a minimal, non-violent disciplinary record."); Redd, 2020 WL 1248493, at *10 (finding that inmate's evidence of rehabilitation favored sentence reduction because inmate "has demonstrated a commitment to self-improvement, devoting hundreds of hours to vocational programs, assisting others in their rehabilitative efforts, exhibiting solid work habits, [and] caring for mental health inmates[.]"); United States v. Perez, No. 88-cr-10094-JTM, 2020 WL 1180719, at *3 (D. Kan. Mar. 11, 2020) (finding that inmate's rehabilitation favored compassionate release where inmate "gained his GED while in prison and has availed himself of various educational programs.").

In addition, Section 3553(a)(1) also considers an inmate's "character, physical and mental condition, family ties, employment, financial resources, community ties, past conduct, criminal history, and drug and alcohol abuse."  Mondaca, 2020 WL 1029024, at *4. Courts have determined that this factor may favor sentence reduction where an inmate "has numerous family ties, including family members who will provide for him."  Id.  Here, a number of Parker's relatives, including Parker's children, nieces, nephews, and even Parker's former spouses, have submitted letters to the Court detailing Parker's substantial family ties and indicating that they plan to provide for him should the Court reduce Parker's sentence.  See, e.g., Dkt. 946 ("Once released, [Parker] has a large family waiting for him to support him and take care of him."); Dkt. 956 at 2 ("my family as a whole, including my immediate family and myself, will provide a strong support base for [Parker] should [the

Court] give him a chance to return to society."); <u>accord</u> Dkts. 938, 940, 942, 944, 948, 954.[12]

The Court therefore concludes that this factor favors a reduction in Parker's life sentence.

### 2.    Need for the Sentence Imposed

Section 3553(a)(2) considers whether a given sentence complies with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." <u>Dean v. United States</u>, 137 S. Ct. 1170, 1175 (2017).  The government avers that Parker's "lifetime term of imprisonment serves the statutory objectives of 18 U.S.C. § 3553(a)(2), including by providing a just punishment that reflects the seriousness of his crimes." Opp. at 20.  The Court disagrees.

While Parker's underlying criminal offenses are undeniably serious, Parker has already served nearly 22 years in prison[13], which "has consumed a large part of his life and by any measure represents a very substantial punishment that reflects the seriousness of his offenses and the need for general or specific deterrence" and "is also a period of time that promotes respect for the law and provides just punishment for his offenses."  <u>Redd</u>, 2020

---

[12]    During the hearing, Parker's counsel represented to the Court that should Parker be released, Parker's son, a firefighter, has agreed to provide Parker with lodging, access to a vehicle, and medical care.

[13]    Because Parker has already served nearly 22 years in prison, Parker likely already would have been released, based on good time credit, had the Court imposed a sentence of 25 years, rather than life in prison.  <u>See</u> <u>Pacheco-Camacho v. Hood</u>, 272 F.3d 1266, 1267 (9th Cir. 2001) ("A federal prisoner may receive 'up to fifty-four days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term,' subject to the BOP's determination that 'during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations.'") (citing 18 U.S.C. § 3624(b)(1)).  Had the Court originally imposed a sentence of 25 years (300 months), that sentence would have exceeded the low end of the 292 to 365 month range the government proposed during the hearing.  Assuming that Parker is eligible for good time credit, the time that Parker has already served would exceed the low end, 292 month sentence.

WL 1248493, at *8. Moreover, given Parker's "extensive use of prison programming, the only thing left 'to provide the defendant with needed education or vocational training' is to pursue an actual vocation." <u>Brown</u>, 2020 WL 2091802, at *10 (citing U.S.C. § 3553(a)(2)(D)). Indeed, Parker avers that he has been offered employment at his family's private investigation and commercial real estate businesses, <u>See</u> Dkt. 935-1 at 6. On balance, the Court concludes that, pursuant to Section 3553(a)(2), there no longer is a need for the Court's original sentence of life imprisonment.

### 3. Remaining Factors

The remaining pertinent section 3553(a) factors require the Court to consider "the kinds of sentences available," "the kinds of sentence and the sentencing range established," "any pertinent policy statement" issued by the Sentencing Commission, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(3)–(6). In addition, the Court "must consider whether the defendant is 'a danger to the safety of any other person or to the community[.]'" <u>Mondaca</u>, 2020 WL 1029024, at *3. The government urges that the remaining Section 3553(a) factors and Parker's risk of endangering others and the community weigh against a reduction in Parker's life sentence.

The Court does not find the government's arguments regarding the remaining Section 3553(a) factors availing. With respect to the Section 3553(a)(3), "[i]ncarceration . . . is not the only kind of sentence available." <u>Brown</u>, 2020 WL 2091802, at *10 (internal citation omitted). To the contrary, "[n]oncustodial sentences also curtail prized liberty interests and the Defendant always faces the harsh consequences that wait if he violates the conditions attached to such a sentence." <u>Id.</u> (internal citation omitted). While the Sentencing Guidelines provided for a life sentence, <u>see</u> Section 3553(a)(4), "they are but one factor." <u>Brown</u>, 2020 WL 2091802, at *10. And, "because the [Sentencing] Commission never released guidelines with respect to compassionate release under the First Step Act," Section 3553(a)(5)'s "'pertinent policy statement' factor is neutral." <u>Id.</u> "Finally, 'the need to avoid unwarranted sentence disparities among defendants with

-24-

similar records who have been found guilty of similar conduct' also cuts in favor of release." Id. (citing 18 U.S.C. § 3553(a)(6)). While Parker received a life sentence, Ruelas, Parker's co-conspirator and half-brother, ultimately received a reduced sentence of 228 months. Similarly, after agreeing to plead guilty, Wilcox and Strickler, the other members of the Deguello group, received sentences of 63 months and 24 months, respectively. See United States v. Wilcox, No. 2:00-cr-00634-CAS (C.D. Cal.) (Dkt. 43); United States v. Strickler, No. 2:00-cr-00048-CAS (C.D. Cal.) (Dkt. 75).

Nor has the government established that Parker poses a danger "to the safety of any other person or to the community" so as to preclude the Court from reducing Parker's life sentence. The government urges that "although agents did not learn of actual violent conduct by [Parker] during his involvement in the conspiracy, [Parker] certainly had the capacity to, and was prepared to, engage in violent acts if necessary to further his drug trafficking activity." Opp. at 17–18. Indeed, the government points out that "[w]hen he was arrested," Parker "had, in his vehicle, at least six firearms, two distraction grenades, and boxes of ammunition." Id. at 18. The government also argues that "[d]anger to the community is not limited to physical violence." Surreply at 19. According to the government, then, "[i]f released from prison and no longer subject to close monitoring, there is a danger that [Parker] may cause economic harm to others, including those who trust him." Id. at 19. The government further asserts that because Parker's "history reflects an unwillingness to follow rules and a disregard for the welfare of others," Parker may, in light of the COVID-19 pandemic, ignore applicable shelter in place orders, "increase[ing] infection rates" and "leading to citizens' severe illness and death." Id. at 20.

Each of the government's concerns is significantly addressed by the fact that when the Court sentenced Parker, the Court ordered that "[i]f released from imprisonment, [Parker] shall be placed on supervised release for a term of five years." Dkt. 599 at 1; cf. Marks, 2020 WL 1908911, at *15 (finding that any risk of danger associated with sentence reduction "can be further mitigated by supervised release."); United States v. Williams, No. 3:04-cr-95-MCR, 2020 WL 1751545, at *3 (N.D. Fla. Apr. 1, 2020) (noting, with

-25-

respect to inmate's motion for compassionate release, that while "the Court cannot conclude . . . that he poses no risk at all to public safety . . . the risk of him engaging in further criminal conduct is minimal and can be managed through . . . the terms of his supervised release."); see also Mondaca, 2020 WL 1029024, at *4 (noting that inmate's compassionate release posed minimal danger because inmate "will be supervised by the Probation Department upon his release from custody through a five year term of supervised release"). Indeed, the Court's original sentence imposed a number of terms and conditions on Parker's potential supervised release, requiring Parker to, *inter alia*, submit to close monitoring with respect to Parker's finances and employment; avoid "commit[ting] another Federal, state or local crime"; and refrain from "possess[ing] a firearm or other dangerous weapon[.]" Dkt. 599 at 2–3. Were Parker to violate any of the terms and conditions of his supervised release, then the Court "may issue a warrant and revoke supervision[.]" Id. at 2.

     In accordance with the foregoing, the Court concludes that neither the remaining Section 3553(a) factors nor Parker's potential risk of danger preclude the Court from reducing Parker's sentence.

## IV.   CONCLUSION

     Parker filed an administrative request with the warden on December 10, 2019, seeking compassionate release on a number of grounds including his deteriorating medical condition, his rehabilitation during incarceration, and his substantial time served in comparison to the sentences the Court imposed on Parker's co-conspirators, including Ruelas, Parker's half-brother. Dkt. 935-1. The warden denied Parker's request on December 19, 2019, and Parker's present motion advances these same grounds for compassionate release. Accordingly, Parker has satisfied Section 3582(c)'s exhaustion requirement. Moreover, the severity of Parker's life sentence, imposed under a sentencing regime that is longer valid, and Parker's medical conditions, which the government acknowledges make Parker even more vulnerable in light of the COVID-19 pandemic, present "extraordinary and compelling" circumstances that justify a reduction in Parker's

-26-

1   sentence.   Finally, a reduction in Parker's life sentence furthers the four purposes of
2   sentencing identified in Section 3553(a): just punishment, deterrence, protection of the
3   public, and rehabilitation.

4       Having determined that a reduction in Parker's life sentence is appropriate, "[t]he
5   final question is what relief to grant."  Marks, 2020 WL 1908911, at *17.   During the
6   hearing, the government restated its position that the Court's original life sentence still
7   remains appropriate today.   The government maintained, however, that to the extent that
8   the Court was inclined to reduce Parker's sentence, rather than reduce Parker's sentence to
9   time served plus five years of supervised release, it would be more appropriate for the Court
10   to reduce Parker's sentence to thirty years of imprisonment plus ten years of supervised
11   release, with the first year of supervised release to be spent in home confinement.

12       The Court concludes, however, that a sentence reduced to **TIME SERVED**,
13   followed by five years of supervised release, subject to the conditions set forth in the
14   Court's amended judgment and commitment order to be issued forthwith, best comports
15   with the FSA and Section 3582(c).   Prior to his release, Parker shall submit to a 14-day
16   quarantine at FCI Florence, inclusive of any time already spent in quarantine immediately
17   preceding this order.   After his 14-day quarantine, Parker shall submit to a further health
18   screening by the BOP.   If Parker is found to be exhibiting symptoms consistent with
19   COVID-19 or is confirmed to have COVID-19, Parker shall not be released to the public
20   absent further order of the Court.   During the period of supervised release, and to the extent
21   possible, Parker shall comply with applicable national, state, and local public-health orders
22   regarding COVID-19.

23       **IT IS SO ORDERED.**
24   DATED:  May 21, 2020

26                                   CHRISTINA A. SNYDER
                                     UNITED STATES DISTRICT JUDGE